IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

LAMONE MORLEE JOHNSON,

               Plaintiff,

v.                                No. 19-CV-269-JFH-JAR

DR. SANDERS, et al.,

               Defendants.

**OPINION AND ORDER**

This action is before the Court on Defendants' Motion for Summary Judgment ("Motion"). Dkt. No. 81. Plaintiff is an inmate in the custody of the Oklahoma Department of Corrections ("DOC") who is incarcerated at Lawton Correctional Facility in Lawton, Oklahoma. She brings this action under the authority of 42 U.S.C. § 1983, seeking monetary and injunctive relief for alleged constitutional violations during her incarceration at Davis Correctional Facility ("DCF"), a private prison located in Holdenville, Oklahoma.[1] The defendants are Dr. Sanders, DCF Physician; Ray Larimer, DCF Health Services Administrator; Ernesto Martinez, DCF Case Manager; Shanna Taylor, DCF Case Manager; and Sgt. Morrison, DCF Correctional Officer. The Court has before it for consideration Plaintiff's Amended Complaint [Dkt. No. 13], Defendants' motion [Dkt. No. 81], Plaintiff's Response to the Motion ("Response") [Dkt. No. 93], and a special report prepared by DCF officials at the direction of the Court, in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978) ("Special Report") [Dkt. No. 31]. As discussed below, the Court concludes the Defendants' Motion should be granted.

---

[1] Because Plaintiff states she identifies as female, female pronouns are used in this Opinion and Order. *See Hardeman v. Smith*, 764 F. App'x 658, 659 n.1 (Feb. 22, 2019) (unpublished).

**Claim One**

Plaintiff, who asserts she is transgender, alleges in Claim One of the Amended Complaint that upon her arrival at DCF on May 15, 2018,[2] Defendant Sgt. Morrison destroyed her eye shadow, foundation, and lip gloss.  Plaintiff claims she had been allowed to order the items through the canteen while incarcerated at Joseph Harp Correctional Center ("JHCC") and was allowed to keep the items when she was transferred to Lexington Correctional Center.  DCF, however, would not allow her to keep them.  Dkt. No. 13 at 5-6.

Plaintiff asserts that when Defendant Sgt. Morrison found the cosmetics upon Plaintiff's arrival at DCF, Morrison told Plaintiff, "Oh hell no, he will not walk around at this facility with make-up."  Plaintiff claims she told Morrison that she is transgender with gender identity disorder and that the JHCC warden had approved them.  When Plaintiff asked Sgt. Morrison to refer to her with female pronouns, Morrison allegedly said, "You are a man in a man's prison.  You will not get your cosmetics unless approved by medical."  Morrison allegedly then confiscated and destroyed the cosmetics.  *Id.* at 7.

Plaintiff subsequently submitted two requests for health services (sick calls), however, the responses by Defendant Ray Larimer stated that the incident was not a "medical" issue.  Plaintiff claims she also submitted an "Inmate Request" to medical on the same day she sent the sick calls, but Defendant Larimer again responded that it was not a medical issue.  Plaintiff next filed a Request to Staff and began the grievance process.  She claims she exhausted her administrative remedies to the best of her knowledge and ability.  *Id.*

---

[2]  The Special Report indicates Plaintiff arrived at DCF on or about May 16, 2018.  Dkt. No. 31 at 4.

**Claim Two**

Plaintiff next claims that on May 15, 2018, Defendants Ray Larimer and Dr. Sanders interfered with Plaintiff's hormone replacement therapy ("HRT") by decreasing, then discontinuing, the medication.  Plaintiff contends she was sentenced to ten years of imprisonment in the DOC on August 26, 2016.  While detained at the Oklahoma County Sheriff's Office before sentencing, she continued to receive her HRT (estradiol) and spironolactone, a testosterone blocker.  When she was sent to DOC's Lexington Assessment and Reception Center on September 22, 2016, she was assessed and her HRT medication was continued.  She subsequently was transferred to North Fork Correctional Center where she signed an agreement to continue her HRT.  When she was transferred to JHCC and Dick Connor Correctional Center ("DCCC"), she allegedly was promised in an agreement with DOC that she would be monitored to see if she was benefitting from the hormones.  *Id.* at 5, 8-9.

Plaintiff alleges her breast tissue was approximately an A-cup size, however, her dysphoria about her body was not being relieved.  Therefore, she wrote to the Transgender Law Center, where she received a MTF (male-to-female) hormone guide.  Plaintiff then submitted a Request for Health Services at DCCC.  On March 26, 2018, the mental health services replied, "Ms. Johnson you have an order for undergarments."  *Id.* at 9; Dkt. No. 13-2 at 19.

On April 20, 2018, Plaintiff returned from a writ to the Oklahoma County Sheriff's Office, where she obtained a copy of her medical records.  The "Transfer Summary" stated a change in her HRT dosage.  Plaintiff submitted a sick call request, and she was informed that before she could receive an adjustment to her medication, a gender dysphoria evaluation was needed.  Plaintiff informed the doctor that she already had been evaluated by the Oklahoma County Sheriff's Office, however, she was advised that she needed an evaluation by a DOC physician.  Dkt. No. 13 at 9.

On May 1, 2018, Plaintiff showed her pictures and medical records to Dr. Patricia Jones. On May 16, 2018, Plaintiff was transferred to DCF and informed by Dr. Shepard and Defendant Larimer that Dr. Jones had found that Plaintiff did not have gender dysphoria. Plaintiff was instead diagnosed with a personality disorder. Therefore, Defendant Larimer told Plaintiff that her HRT would be discontinued by August 2018. Plaintiff maintains that according to the Transgender Law Center, she meets all the criteria for gender dysphoria and gender identity disorder. *Id.* at 9-10.

Plaintiff argues she has "felt this way" since she was ten years old, and she has socially changed her name and daily appearance to cope with her dysfunctional sex assigned at birth. She insists that denying her HRT violates her right to treatment for her serious medical condition. She further claims she suffers from physical and mental injures, including "back pain, breast-swelling, dreadfully dried hair, breast-dryness, breast-sagging, vomiting, chemical-hormonal imbalance, neck pain." Her mental injuries are "depression, gender identity disorder (increased), self-hatred, suicidal thought and attempts." *Id.* at 10-11.

**Claim Three**

Plaintiff alleges in Claim Three that on March 14, 2019, Defendants Shanna Taylor and Ernesto Martinez retaliated against her for filing grievances by holding her at DCF where there are other inmates who are paid to kill her. These defendants also allegedly issued false misconducts and placed "separations" on Plaintiff and another DCF inmate. *Id.* at 12.

**Claim Four**

In Claim Four Plaintiff asserts that on March 14, 2019, Defendant Martinez discriminated against her for being a part of the "LGBTQIP" community by placing "separations" on her and another inmate named Marquis Porter, because Porter is a gay male. *Id.* at 12.

**Standard of Review**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. A party opposing a motion for summary judgment, however, may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c). Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**Eighth Amendment Claim - Medical and Mental Health Treatment (Claim Two)**

Plaintiff claims she was denied hormone replacement therapy by Dr. Sanders and Nurse Larimer. Fred Sanders, D.O., is the "qualified medical provider" at DCF. Dkt. No. 81-1 ¶ 14. Raymond Larimer, R.N., is the DCF Health Services Administrator. Dkt. No. 81-4 ¶ 1. Defendants Sanders and Larimer allege they did not deny or delay Plaintiff's access to medical or mental health treatment.

The Tenth Circuit Court of Appeals recently discussed a claim of deliberate indifference in the context of a prisoner's claim of gender dysphoria:

> Deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "Deliberate indifference involves both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir.

5

2000) (internal quotation marks omitted).  The objective component requires the plaintiff to show that her medical need is "sufficiently serious"; that is, "it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotation marks omitted).  We assume, without deciding, that gender dysphoria satisfies the objective component.

The subjective component requires the plaintiff to show that the prison official knew of and disregarded "an excessive risk to inmate health or safety." *Id.* (internal quotation marks omitted).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (internal quotation marks omitted).

*Hardeman v. Smash*, No. 21-7018, 2022 WL 470741 (10th Cir. Feb. 16, 2022) (unpublished).

Causation is a necessary element of a §1983 claim of deliberate indifference.  *See Daniels v. Gilbreath*, 668 F.2d 477, 488 (10th Cir. 1982).  Not every claim of inadequate medical treatment rises to the level of a constitutional violation.  A claim of medical malpractice or negligence plainly does not equate to a constitutional violation.  *See Whitley v. Albers*, 475 U.S. 312, 319 (1986) (Eighth Amendment liability requires "more than ordinary lack of due care for the prisoner's interests or safety") (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)).  Further, it is well settled that a difference of opinion as to the kind and quality of medical treatment necessary under the circumstances fails to give rise to a cause of action under § 1983.  *See McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977), *cert. denied*, 435 U.S. 917 (1978), and cases cited therein.

The record shows that DOC placed Plaintiff at DCF pursuant to an incarceration services contract between DOC and CoreCivic, Inc.  Dkt. No. 81-6 ¶ 2.  DCF follows DOC's medical and mental health policies.  Dkt. No. 81-4 ¶15.  Oklahoma DOC policy OP-140147 is titled "Management of Gender Nonconforming Inmates."  Dkt. No. 81-5.  DOC OP-140147(I)(H) of the policy defines gender dysphoria as "[a] condition where there is clinically significant discontent

6

or distress with one's sex assigned at birth and/or the gender roles associated with that sex." Dkt. No. 81-5 at 3.

In determining whether an inmate is gender nonconforming, OP-140147 (II) directs that the following be taken into consideration: (A) self-identification as gender nonconforming by completion of a Self Report Form; (B) conformation of a diagnosis of gender dysphoria by a qualified mental health professional based on the diagnostic criteria of the *Diagnostic and Statistical Manual of Mental Disorders*; and (C) the inmate's appearance and/or behavior does not match the gender identity on his or her documents. Dkt. No. 81-5 at 3-4.

DOC OP-140147(IV)(C)(1) sets forth the process to determine when hormonal treatment of an inmate with gender dysphoria may be undertaken. Under the policy, hormonal treatment may be undertaken only after all the following occurs: (a) diagnosis of gender dysphoria has been confirmed by a qualified mental health professional based on the diagnostic criteria of the *Diagnostic and Statistical Manual of Mental Disorders*; and (b) a Male to Female Hormonal Therapy Risk Information Form is read, signed by the inmate, and scanned into the inmate's electronic health record. Dkt. No. 81-5 at 5. The policy further states that:

> Once the above steps have been completed, hormonal treatment may be considered by the qualified medical provider if:
>
> (a)    Hormonal treatment was initiated prior to incarceration; or
>
> (b)    Surgical castration has occurred, verified by examination and/or medical records; or
>
> (c)    The facility medical provider determines hormone treatment is medically necessary, and approval from the Chief Medical Officer is obtained.

DOC OP-140147(IV)(C)(2) [Dkt. No. 81-5 at 5-6].

Plaintiff alleges in her Amended Complaint that on April 20, 2018, about a month before her transfer to DCF, she was returned to DCCC after having been out on a writ to the Oklahoma

County Sheriff's Office.   At that time, Plaintiff submitted a sick call request asking for a medication adjustment for a hormone replacement therapy prescription.   She was specifically advised by staff at DCCC that a doctor would need to evaluate her for gender dysphoria before she could receive a medication adjustment.

Patricia Jones, Psy.D., a psychologist for DOC, met with and evaluated Plaintiff on May 1, 2018.   Dr. Jones completed an eight-page confidential psychological report and a one-page statement of general findings on May 11, 2018.   Dkt. No. 84-1 at 21-29.   In her statement of general findings, Dr. Jones unequivocally stated the following:   "Inmate Johnson does not meet the criteria for Gender Dysphoria."   *Id*. at 21.   DOC Policy OP-140147(IV)(C) for the management of gender nonconforming inmates clearly states that unless a diagnosis of gender dysphoria is confirmed by a qualified mental health professional based on the diagnostic criteria of the *Diagnostic and Statistical Manual of Mental Disorders*, hormonal treatment may not be undertaken.   Dkt. No. 81-5 at 5.

Plaintiff was evaluated by DCF medical staff (James Sanford, R.N.), and by mental health staff (Victoria Shepherd, MEd, LDAC, LPC) upon her arrival at that facility on May 16, 2018.   Dkt. No. 81-1 ¶ 6-7; Dkt. No. 81-3 ¶ 5; Dkt. No. 81-4 ¶¶ 10, 12.   Both Mr. Larimer and Ms. Shepherd charted their evaluations of Plaintiff.   Dkt. No. 81-4 ¶¶ 10, 12; Dkt. No. 84-1 at 2-6.   Ms. Shepherd recommended that Plaintiff have an appointment with the facility psychiatrist, Dr. Lantrip, at the next available appointment.   Dkt. No. 81-3 ¶ 5; Dkt. No. 84-1 at 5.   However, when Ms. Shepherd next met with Plaintiff on May 22, 2018, Plaintiff waived receipt of any further mental health services or mental health prescribed medications.   Dkt. No. 81-3 ¶ 6; Dkt. No. 84-1 at 18-19.

On May 23, 2018, Fred Sanders, D.O., DCF medical provider, conducted a review of Plaintiff's medical chart and also staffed Plaintiff's chart with the mental health staff. Dr. Sanders noted that the transgender/gender dysphoria diagnosis of Plaintiff had been rejected by the DOC mental health specialist conducting gender dysphoria evaluations. Dr. Sanders also noted that the day before, Plaintiff had refused and waived all mental heath services and medications. Dkt. No. 81-1 ¶¶ 18-21.

Defendants maintain that without confirmation of a gender dysphoria diagnosis, it would have been completely inconsistent with DOC policy and process for the management of gender nonconforming inmates for Dr. Sanders to continue to prescribe estradiol and spironolactone to Plaintiff. In addition, there was a clear finding by Dr. Jones that Plaintiff did not meet the criteria for gender dysphoria, and there was no objective evidence in the medical record that hormonal treatment had been initiated prior to Plaintiff's incarceration. Examination and medical records verifed that Plaintiff had not had surgical castration, and Dr. Sanders had made no determination that hormone treatment of Plaintiff was medically necessary. Further, DOC's Chief Medical Officer had not approved of such treatment.

On May 23, 2018, Nurse Larimer and Victoria Shepherd met with Plaintiff in the DCF mental health office. Nurse Larimer explained to Plaintiff that because Dr. Jones had not confirmed the diagnosis of gender dysphoria, Dr. Sanders would be reducing the dosage and then discontinuing the prescribed medications, estradiol and spironolactone. Dkt. No. 81-4 ¶ 20; Dkt. No. 81-3 ¶ 14; Dkt. No. 84-1 at 38-39.

Clearly, the Eighth Amendment prohibits prison officials from acting with deliberate indifference to a prisoner's serious medical need. *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) (citing *Estelle*, 429 U.S. at 104-06). After careful review, this Court finds

there is no indication that Defendants Dr. Sanders or Nurse Larimer were deliberately indifferent in their approach to Plaintiff's alleged medical needs.

There was no confirmed diagnosis of gender dysphoria, which is the first step in a qualified medical providers' decision-making.  If there had been a confirmed diagnosis, the medical providers could have proceeded to the next step, which would have been completion of the Male to Female Hormonal Therapy Risk and Information Form.  Upon completion of Steps 1 and 2, the qualified medical provider then could proceed to Step 3, the actual consideration of prescribing hormonal treatment.  However, the policy process requires the qualified medical provider to consider whether hormonal treatment had been initiated prior to incarceration, or if surgical castration had been performed, or if the facility medical provider had determined that hormonal treatment was medically necessary and had been approved by the Chief Medical Officer.  Dkt. No. 81-5 at 5-6.

Because there was no confirmed diagnosis of gender dysphoria, the above analysis was not performed.  Plaintiff obviously disagreed with Dr. Jones' determination in her May 11, 2018, report, which was placed in Plaintiff's electronic health record only a few days prior to Plaintiff's arrival at DCF.  However, DCF understood that Dr. Jones was the qualified gender dysphoria evaluator for the DOC.  Dkt. No. 81-4 ¶ 18.

Plaintiff's disagreement with Dr. Jones' report does not create a reasonable inference of deliberate indifference by Dr. Sanders or Nurse Larimer.  *See Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018).  Notably, Dr. Sanders did not abruptly discontinue the prescribed medications, instead tapering off the dosage over a period of months.  Dkt. No. 8-1 ¶¶ 20-22; Dkt. No. 84-1 at 36-39.

10

The medical treatment that was provided to Plaintiff was different from what she wanted. While she may have benefitted from participating in counseling and other mental health services while housed at DCF, she refused and waived receipt of medical services, thereby limiting her options for treatment of her documented personality disorder. Plaintiff was, however, periodically seen by the facility psychiatrist, the facility's nurse practitioner, and other member of the facility's nursing and mental health staff. Dkt. No. 81-3 ¶¶ 16-18.

Plaintiff alleges in her Response to Defendants' Motion that she never complained about gender dysphoria to Nurse Sanford. Instead, Plaintiff put the DCF medical officers on notice that she is a transgender woman who had been diagnosed with gender dysphoria. Dkt. No. 93 at 2.

Plaintiff also reiterates in her Response to the Motion that while she was incarcerated at the Oklahoma County Jail, a psychologist diagnosed her with gender dysphoria, and she was placed on hormone therapy. After she was transferred to DOC, she continued with her hormone therapy for two years without any interruptions. While incarcerated at DCCC, Plaintiff requested an increase in her hormone therapy, and she was scheduled for an evaluation by Dr. Patricia Jones, a certified mental health professional. Dr. Jones, however, reported that Plaintiff did not have gender dysphoria. Dkt. No. 93 at 3-4. Plaintiff further alleges that after she was transferred from DCF on December 4, 2019, she was re-evaluated and determined to have gender dysphoria. *Id.* at 1-2, 6.

Plaintiff apparently is arguing that DCF should have accepted her previous diagnosis of gender dysphoria from the Oklahoma County Jail. However, after she was received by the DOC, she was subject to its policies and procedures for such diagnoses.

After careful review, the Court finds there are no genuine issues of material fact with regard to whether Defendants Sanders and Larimer were deliberately indifferent to Plaintiff's serious

11

medical need regarding her alleged gender dysphoria.  Accordingly, Defendants Sanders and

Larimer's motion for summary judgment for Ground Two of the Amended Complaint [Dkt. No.

81] is granted.

**Exhaustion of Administrative Remedies (Grounds One, Three, and Four)**

Defendants' Motion also alleges that Plaintiff failed to exhaust the administrative remedies

for her claims of denial of due process, retaliation, and discrimination in Claims One, Three, and

Four before raising the claims in this civil rights action.  Her allegedly unexhausted claims are:

> **Ground One:**   She was denied due process in violation of the Fourteenth
> Amendment when three items of cosmetics were seized by facility staff upon her
> arrival at DCF.
>
> **Ground Three:**  She was subjected to retaliation by Defendants Shanna Taylor and
> Ernesto Martinez in violation of the First Amendment after she filed grievances.
>
> **Ground Four:**  She was denied equal protection by certain facility staff by the
> placement of separations on her and another inmate in violation of the Fourteenth
> Amendment because Plaintiff is LGBTQIP.

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with

respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative remedies as are

available are exhausted."  42 U.S.C. § 1997e(a).  Inmates are required to exhaust available

administrative remedies, and suits filed before the exhaustion requirement is met must be

dismissed.  *Booth v. Churner*, 532 U.S. 731, 740-41 (2001); *Yousef v. Reno*, 254 F.3d 1214, 1216

n.1 (10th Cir. 2001).  "An inmate who begins the grievance process but does not complete it is

barred from pursuing a § 1983 claim under PLRA for failure to exhaust her administrative

remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted).

According to DCF Grievance Coordinator Terry Underwood, by contract, DCF utilizes the

Oklahoma DOC Offender Grievance Process, OP-090124.  Dkt. No. 81-10 ¶¶ 4-5; Dkt. No. 81-

11. Under the Offender Grievance Process, an inmate first must attempt to resolve her complaint informally by communicating with staff within three days of the incident.  If that is unsuccessful, she may submit a Request to Staff (RTS) within seven calendar days of the incident, alleging only one issue per form.  If the offender does not receive a response to her RTS within 30 calendar days of submission, she may submit a grievance to the Review Authority, asserting only the issue of the lack of response to the RTS.  If the complaint is not resolved after the response to the RTS, the offender then may file a grievance.  If the grievance also does not resolve the issue, the inmate may appeal to the Administrative Review Authority or the Chief Medical Officer.   The administrative process is exhausted only after all of these steps have been taken.  Dkt. No. 81-10 ¶ 5; Dkt. No. 81-11  at 7-16.

Ms. Underwood maintains the DCF grievance records.  She states by affidavit that she has reviewed the administrative remedies records submitted by Plaintiff during her incarceration at that facility.  Dkt. No. 81-10 ¶ 7.  Ms. Underwood asserts that Plaintiff's submissions frequently contained procedural defects.  Dkt. No. 81-10 at ¶¶ 8-18.  The grievance policy clearly states that if instructions are not followed, submitted grievances may not be answered.  Dkt. No. 81-11.

Plaintiff submitted an RTS on or about May 22, 2018, to Defendant Ray Larimer, Health Services Administrator, asking that undergarments and cosmetics be approved.  Nurse Larimer's June 4, 2018, response denied the request, because Plaintiff had not been approved to have the items.  On June 22, 2018, Plaintiff submitted Grievance No. 2018-160, requesting that she be reimbursed for the value of the items.  The grievance was returned to Plaintiff unanswered on June 26, 2018, with a memorandum specifically advising that property issues are not grievable to DOC and that Plaintiff must use the property claim process in CoreCivic Policy 14-6.  Plaintiff next submitted an appeal of the grievance response to the DOC ARA, which was returned unanswered

13

on July 24, 2018, with a notation that it was received out of time. No issue was properly exhausted. Dkt. No. 81-10 ¶ 8; Dkt. No. 31-8 at 2-9.

Sgt. Mary Morrison, DCF Property Officer, has submitted an affidavit stating that Policy 14-6 of the property claim process is the method to exhaust a claim concerning property. As Property Officer, Sgt. Morrison logs and processes property claims filed by inmates. According to Sgt. Morrison, she reviewed the facility's property claims, and Plaintiff did not file a 14-6 property claim concerning her three cosmetic items. Dkt. No. 81-6 at ¶ 12. Plaintiff claims she was not advised of the procedure for property claims and had no way to find out about it [Dkt. No. 93 at 32], however, she was advised of the policy in her returned grievance [Dkt. No. 31-8 at 4]. Therefore, Plaintiff did not exhaust Claim One.

Regarding Claims Three and Four, Grievance Coordinator Underwood states in her affidavit that Plaintiff did not submit any grievance asserting a claim of retaliation by false misconducts and separations by Unit Manager Martinez or Case Manager Taylor, or a claim of discrimination against Martinez regarding Inmate Porter. Dkt. No. 81-10 ¶ 20. Plaintiff contends in her Response to the Motion she filed an RTS that was not answered. She, however, apparently did not follow the procedure for an unanswered RTS. Dkt. No. 81-11 at 9. Therefore, Claims Three and Four are unexhausted.

Defendants maintain that Plaintiff had access to the grievance process and the property claim process. The necessary forms were available, however, most of Plaintiff's filings were not made properly or not made at all. Plaintiff alleges in her response to the motion that "Defendant's Interpretation of PLRA violates the U.S. Constitution of Plaintiffs First, Fifth and Fourteenth amendment rights of access to courts and Equal Protection, awarding them summary judgement

14

would insult the Supreme Law of land and make PLRA unconstitutional."  Dkt. No. 93 at 35 (spelling and syntax in original).

After careful consideration of the pleadings and other submitted materials in this case, the Court is of the view that there are no genuine issues of material fact concerning whether Plaintiff's claims in Grounds One, Three, and Four are unexhausted.  Summary judgment is GRANTED for these claims.

THEREFORE, Defendants' motion for summary judgment [Dkt. No. 81] is GRANTED.

IT IS SO ORDERED this 8th day of April 2021.

_____

JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE